**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

ROBERT JOSEPH BENGE,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀1:18cv648
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
RANDOLPH COUNTY, et al.,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Defendants.⠀⠀⠀)

<u>**MEMORANDUM OPINION AND RECOMMENDATION**</u>
<u>**OF UNITED STATES MAGISTRATE JUDGE**</u>

⠀⠀⠀⠀This case comes before the undersigned United States Magistrate Judge on "Defendant [] Love's Motion for Summary Judgment" (Docket Entry 31) (the "Officer Love Motion"), "Motion for Summary Judgment by Southern Health Partners, Inc." (Docket Entry 34) ("the SHP Motion"), "Motion for Summary Judgment by Lynne Barber, RN" (Docket Entry 36) ("the Nurse Barber Motion"), and "Motion for Summary Judgment of Defendant Captain Hill" (Docket Entry 41) (the "Captain Hill Motion"). For the reasons that follow, the Court should grant the instant motions.

<u>**BACKGROUND**</u>

⠀⠀⠀⠀Robert Joseph Benge (the "Plaintiff"), a "parole violator [from the S]tate of Arizona" (Docket Entry 2 ("the Complaint") at 7), commenced this action <u>in</u> <u>forma</u> <u>pauperis</u> pursuant to 42 U.S.C.

§ 1983 in connection with his incarceration at the Randolph County Detention Center (see generally Docket Entry 2).[1]  The Court subsequently dismissed all claims against Randolph County, Sheriff Robert Graves, Archdale Police Department, and Magistrate B.A. McPherson ("Magistrate McPherson").  (Docket Entry 6.)  As a result, the surviving claims in the Complaint concern three law enforcement/correctional officers - Captain Hill, Officer P. Love ("Officer Love"), and "Lieutenant John Doe" - as well as "Nurse Jane Doe, D.O.N." ("Nurse Barber"), and her employer Southern Health Partners ("Defendant SHP"), which provides health services to inmates under a contract with Randolph County.  (Docket Entry 2 at 2; see also Docket Entry 20 at 1.)

In his unverified Complaint, Plaintiff asserts the following:

On 12/01/2017[,] Archdale Police Dep[artmen]t came to [his] siste[r]'s home and arrested [him] without a warrant on behalf of Arizona Dep[artmen]t of Corrections. [Plaintiff] advised them that [he] had a spinal cord injury and fell on 11/29/17 and 12/01/17[.  Plaintiff] had planned to go to the ER.  They didn't have [Plaintiff] checked by a doctor before tak[ing him] to jail.

On 12/01/2017[,] Randolph County Jail accepted [Plaintiff] into the jail although they had no warrant to provide to [him.  Plaintiff] told them that [he] had a spinal cord injury [as he] had fallen twice on 11/29/17 [and] 12/01/17 and was in pain. [Plaintiff] had several medications in a bag with [his] name on all RX bottles

_____

1 Citations to Docket Entry pages utilize the CM/ECF footer's pagination.  In addition, in quoting Plaintiff's filings, this Recommendation applies standard capitalization conventions for ease of reading.

Case 1:18-cv-00648-LCB-LPA   Document 49   Filed 07/10/20   Page 2 of 35

> from Walgreens, yet [the Randolph County Jail] defendants
> stopped all [Plaintiff's] medications 'cold turkey.'

(Docket Entry 2 at 7 (parenthesis omitted).)

Based upon these assertions, Count One of the Complaint alleges that Officer Love (and Lieutenant John Doe) "completely disregarded Plaintiff's due process health issues and [] had a sufficiently culpable state of mind and therefore were deliberate[ly] indifferen[t] toward[] Plaintiff []." (Id. at 16.) Additionally, Count One states that those Defendants further "violated [his] civil and constitutional rights while confined as guaranteed by the 14th [and] 8th Amendments by their false arrest, warrantless arrest, [and] failure to produce documentation from the demanding State of Arizona." (Id.) Moreover, according to the Complaint, "[D]efendants in Count One failed to consider Plaintiff []'s loss of liberty as well as his pain and suffering with their denial of appropriate early medical intervention." (Id. at 18.) Count Two, in turn, states that Captain Hill, Defendant SHP, and Nurse Barber "fail[ed] to treat Plaintiff's condition [which] result[ed] in further significant injury[] and absolutely was unnecessary and caused wanton infliction of pain. [Their] response was deliberately indifferent." (Id. at 33.) Plaintiff pursues these claims against all Defendants in both their individual and official capacities. (Id. at 5-6.)

In light of these allegations, the Complaint maintains that Plaintiff's "experience was kafkaesque given his loss of liberty

3

and mental torment. [His] unnecessary pain and suffering was preventable. Given all Defendants['] actions/inactions in Count One and Count Two, [Plaintiff] suffer[ed] PTSD." (Id. at 36 (quotation marks omitted).) As a result, the Complaint demands "compensa[tory] and punitive damages in an amount of $7.9 million[,] $370,000 for pain and suffering for deliberate indifference, $520,000 for pain and suffering on the civil rights claim, and $7 million in punitive damages. Plaintiff further request[s] that this Court award in his favor reasonable [a]ttorney's fees and costs." (Id.)

In response, Defendant SHP, Nurse Barber, Captain Hill, and Officer Love answered, denying any improper actions and asserting immunity defenses. (Docket Entries 14, 20, 22.)[2] Following a six-month period for discovery (see, e.g., Text Order dated Apr. 17, 2019), Officer Love, Defendant SHP, Nurse Barber, and Captain Hill filed the instant motions (see Docket Entries 31, 34, 36, 41; see also Docket Entry 32 (Officer Love's summary judgment brief); Docket Entry 32-1 (Affidavit of Officer Love); Docket Entry 35 (Defendant SHP's summary judgment brief); Docket Entry 37 (Nurse Barber's summary judgment brief); Docket Entry 38 (Affidavit of Nurse Barber); Docket Entry 39 (Affidavit of Jessica Davis, LPN);

_____

    2 Defendant SHP and Nurse Barber filed a joint Answer and a joint Reply as to their summary judgment motions. (See Docket Entries 20, 48.)

Docket Entry 42 (Captain Hill's summary judgment brief); Docket
Entry 42-1 (Affidavit of Captain Hill)).

As to each of the instant motions, the Clerk notified
Plaintiff of his "right to file a 20-page response in opposition
. . . accompanied by affidavits setting out [his] version of any
relevant disputed material facts or . . . other responsive
material." (Docket Entry 33 at 1; accord Docket Entry 40 at 1;
Docket Entry 43 at 1.) The letters warned Plaintiff that his
"failure to respond or, if appropriate, to file affidavits or
evidence in rebuttal within the allowed time may cause the [C]ourt
to conclude that [Defendants'] contentions are undisputed and/or
that you no longer wish to pursue the matter." (Id.) Further, the
letters instructed Plaintiff that "[a] response to [the] motion[s]
for summary judgment must be filed within 30 days from the date of
service on [him]." (Id.) Plaintiff thereafter filed an unverified
response (Docket Entry 44) and untimely supplement (Docket Entry
45),[3] after which Defendants replied (Docket Entries 46, 47, 48).

_____

    3 Defendants filed the instant motions on November 15, 2019,
and November 20, 2019. (See generally Docket Entries 31, 34, 36,
41.) Pursuant to the Local Rules, "[t]he respondent, if opposing
a motion, shall file a response, including brief within . . . 30
days." M.D.N.C. LR 7.3(f). As Defendants have correctly
contended, "even considering the 'Prisoner Mailbox Rule,'" and
"Rule 6(d) of the Federal Rules of Civil Procedure," Plaintiff's
response(s) "would have been due on December 23, 2019." (Docket
Entry 48 at 1-2.) "However, Plaintiff's [s]upplement[ ] was not
executed and delivered to prison officials for filing until
December 31, 2019 . . . ." (Id. at 2.) That untimeliness
ultimately remains irrelevant, as the supplement (and attached
                                              (continued...)

## I. Summary Judgment Standards

"Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Welton v. Durham Cty., No. 1:17CV258, 2018 WL 4656242, at *2 (M.D.N.C. Sept. 27, 2018) (unpublished) (citing Fed. R. Civ. P. 56(a)), aff'd, 781 F. App'x 242 (4th Cir. 2019). "The moving party has the initial burden of demonstrating the absence of any material issue of fact; [however,] once the moving party meets its initial burden, the non-moving party must come forward with evidentiary material demonstrating the existence of a genuine issue of material fact requiring a trial." Heggins v. City of High Point, No. 1:16CV977, 2017 WL 6514681, at *2 (M.D.N.C. Dec. 20, 2017) (unpublished) (emphasis added); see also Equal Employ. Opportunity Comm'n v. Womble Carlyle Sandridge & Rice, LLP, No. 1:13CV46, 2014 WL 2916851, at *4 (M.D.N.C. June 26, 2014) (unpublished) ("On those issues for which the non-moving party has the burden of proof, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence . . . ."), aff'd, 616 F. App'x 588 (4th Cir. 2015).

---

3(...continued)
affidavits) do not provide any evidence that would alter Defendants' entitlement to summary judgment.

In assessing such matters, "the Court [does] not consider[ ] 'facts' set forth in [summary judgment] briefs that are not supported by citations to admissible evidence." <u>Maisha v. University of N.C.</u>, No. 1:12CV371, 2015 WL 277747, at *1 (M.D.N.C. Jan. 22, 2015) (unpublished), <u>aff'd</u>, 641 F. App'x 246 (4th Cir. 2016). Additionally, "[u]nless [D]efendant[] admitted [an] alleged fact in [his A]nswer, the Court [does] not consider[ the] unverified statements in [Plaintiff's C]omplaint. [Such] allegations are not under oath and are not evidence." <u>Id.</u> (internal parenthetical citations omitted) (citing <u>Higgins v. Scherr</u>, 837 F.2d 155, 156-57 (4th Cir. 1988)).

## II. Individual Capacity Claims

### A. Deliberate Indifference

The Complaint's allegations primarily relate to Plaintiff's claim(s) that Defendants deprived him of his constitutional rights through their "fail[ure] to provide [him] with proper medical care" during the period of his arrest and subsequent incarceration at the Randolph County Detention Center. (Docket Entry 2 at 4.) In this regard, the Complaint asserts that Plaintiff "was processed into the Randolph County Jail through an inadequate assessment. [He] had a bag of several RX bottles, current RX[]s including his psychotropic [sic] medications. [Plaintiff] had been diagnosed with post-traumatic stress disorder (PTSD), bipolar disorder and depression." (<u>Id.</u> at 30.) At the time of his processing at the jail, Plaintiff

7

also allegedly possessed "[m]edications for a spinal cord injury and his insulin as [he] is a [T]ype 2 diabetic." (Id.) The Complaint states that Defendants "failed [him] as they took no reasonable measures to abate the impermissible harm [that he] suffered by having his medications stopped 'cold turkey,' and their refusal to allow [him] to see a medical doctor for x-rays." (Id. at 29.)

Additionally, the Complaint alleges that, "[o]nce Plaintiff did start receiving his medications on or about December 9, 2017[,] his medications regimen had been drastically altered." (Id. at 30-31 (quotation marks omitted).) According to the Complaint, "not once during his 14 days of detention . . . [was] his blood sugar checked, monitored, nor did he receive insulin medications." (Id. at 31.) The Complaint also maintains that, "[o]n 12-03-17, 12-05-17, [and] 12-09-17[, Plaintiff] submitted sick call slips about his falls on 11-29-17 [and] 12-01-17 to no avail." (Id.) Further, the Complaint states that Plaintiff "begged almost daily to be examined by a physician and that never happened. The times that [he] did go to medical, he only had his vital signs monitored [in a ] courtesy visit." (Id.) Finally, in his (unverified) response to the instant motions, Plaintiff baldly asserts that "[t]here is a very high probability that the delay [sic] lack of treatment reasonably contributed to [his] adverse outcome given what we know about [his]

most recent MRI's dated 12/07/19 and 12/14/19, see attachment."
(Docket Entry 44 at 10.)[4]

### 1. Deliberate Indifference Standards

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989). In other words, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." Id. at 200.

For a claim based on inadequate medical care, Plaintiff "must demonstrate that the [officials] acted with 'deliberate indifference' (subjective) to the inmate's 'serious medical needs' (objective)." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). "Deliberate indifference is a very high standard-a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir.

_____

4 Plaintiff failed to provide the referenced "attachment" with either his response or untimely supplement. (See Docket Entry 44 at 1-12; Docket Entry 45 at 1-15.)

9

1999). Instead, the "deliberate indifference" prong requires Plaintiff to make "two showings":

> First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the [official] *should have* recognized it; [he] actually must have perceived the risk. Second, the evidence must show that the official in question subjectively recognized that his actions were inappropriate in light of that risk. As with the subjective awareness element, it is not enough that the official *should have* recognized that his actions were inappropriate; the official actually *must have* recognized that his actions were insufficient.

Parish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (internal citations and quotation marks omitted) (emphasis in original).

"The subjective component therefore sets a particularly high bar to recovery." Iko, 535 F.3d at 241. Indeed, "[t]o establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), overruled in part on other grounds by, Farmer v. Brennan, 511 U.S. 825, 836-38 (1994). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a [Section] 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

10

Further, "'[i]f a prisoner is under the care of medical experts, a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands.'" Iko, 535 F.3d at 242 (ellipsis in original omitted) (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004)). "To bring [such] a constitutional claim against non-medical prison personnel, an inmate must show that such officials were personally involved with a denial of treatment, deliberately interfered with a prison doctor's treatment, or tacitly authorized or were indifferent to the prison physician's misconduct." Krug v. Loranth, No. 1:13CV1409, 2014 WL 4955365, at *7 (D.S.C. Sept. 29, 2014) (unpublished) (citing Miltier, 896 F.2d at 854), aff'd, 599 F. App'x 512 (4th Cir. 2015).

2. Defendant SHP

Turning to the specific allegations against each Defendant, the Complaint states that Defendant SHP "acted under color of law and Randolph County policies that caused Plaintiff harm, by their own policy to stop med[ications] 'cold turkey.'" (Docket Entry 2 at 10.) More specifically, the Complaint alleges that "[t]he abrupt discontinuation of Plaintiff's medication was due to . . . [Defendant SHP's] instruction, policy, custom, and decisions [] not to issue any new medications to prisoners." (Id. at 30 (parenthesis omitted).) Further, according to the Complaint, Defendant SHP's "policy was deliberately indifferent and was causally connected as the moving force to the deprivation. They [] were acting/operating

11

under a policy of providing deficient health care to prisoners[] in order to save money." (Id. at 35.) Plaintiff's response to the SHP motion repeats, in a conclusory manner, that, "[Defendant SHP]'s custom[s and] policies w[ere] the moving force behind [his] constitutional rights and this falls under a Monell theory of liability. [Defendant SHP's] policy choices, in which no one person was responsible for coordinating [Plaintiff's] overall care, violated his rights." (Docket Entry 44 at 6.)[5]

Conversely, Defendant SHP has argued that the Complaint's Section 1983 deliberate indifference claim against it cannot survive under the theory of respondeat superior (see Docket Entry 35 at 5-6), and, in any event, neither the Complaint nor Plaintiff's response offers even an "allegation related to any specific policy of [Defendant] SHP, nor any allegation identifying the nature of any respective policy, practice, or custom that has led to [Plaintiff's] alleged injury" (id. at 7; see also Docket Entry 48 at 3).

The Fourth Circuit has conditioned liability for private corporations under Section 1983 on the same requirements established for municipal corporations. See Rodriguez v. Smithfield Packing Co, Inc., 338 F.3d 348, 355 (4th Cir. 2003). Consistent with that view, a respondeat superior theory cannot support such liability as a matter of law. See Austin v. Paramount Parks, Inc., 195 F.3d 715,

_____

5 Plaintiff's untimely supplement presents no competent evidence that Defendant SHP's policies or customs caused any harm alleged in the Complaint. (See Docket Entry 45 at 1-15.)

12

728 (4th Cir. 1999). Therefore, Defendant SHP correctly contends that Plaintiff's claim cannot survive under a theory of respondeat superior because "[t]he same standards that apply to municipalities apply to [Defendant SHP]. Thus, [Defendant SHP] cannot be liable for [employees'] conduct under a respondeat superior theory." Smith v. Atkins, 777 F. Supp. 2d 955, 968 (E.D.N.C. 2011) (citing West v. Atkins, 487 U.S. 42, 54-58 (1988), Polk Cty. v. Dodson, 454 U.S. 312, 325-26 (1981), and Monell v. Department of Soc. Servs., 436 U.S. 658, 694 (1978)) (some internal citations omitted).

Instead, to establish Section 1983 liability for a private corporation, a plaintiff must show that "an official policy or custom of the corporation cause[d] the alleged deprivation of federal rights." Austin, 195 F.3d at 728. However, here, Plaintiff has not provided evidence "sufficient to support this sort of claim. A litigant 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another' as Plaintiff admittedly attempts here." Legg v. Southern Health Partners, Civ. No. 1:12-481, 2013 WL 474804, at *4 (D.S.C. Feb. 7, 2013) (unpublished) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)), aff'd, 552 F. App'x 205 (4th Cir. 2013).

In sum, the record warrants summary judgment for Defendant SHP on this claim.

13

### 3. Nurse Barber

According to the Complaint, Nurse Barber's "acts or omissions deprived Plaintiff of his rights to medical care and her acts and omissions were under color of law[,] Randolph County policies. She allowed Plaintiff's medications to stop cold turkey." (Docket Entry 2 at 10.) More specifically, the Complaint alleges that she

> repeatedly ridiculed [Plaintiff] for 'faking' his symptoms[ and] advised [him] that she suspected aberrant drug seeking behavior. [Plaintiff] told her that he would see her in [f]ederal [c]ourt. She told [Plaintiff] that she[ was] not concern[ed] as she was following Randolph County and [Defendant SHP's] policies. [Nurse Barber] was a gatekeeper to Plaintiff [] receiving his medications and being seen by a physician. She was deliberately indifferent to Plaintiff's serious medical needs. As Director of Nursing[, Nurse Barber] neglected Plaintiff's serious medical needs by failing to manage, support, supervise, and administer medical care to Plaintiff [which] is a direct violation to Plaintiff's rights under the Eighth and Fourteenth Amendments.

(Id. at 31-32.)

Nurse Barber's summary judgment brief maintains that "Plaintiff cannot, as a matter of law, present evidence of a claim for deliberate indifference against [her], as she was not one of the medical providers who saw or treated, or was assigned to see or treat, Plaintiff at any time during his incarceration." (Docket Entry 37 at 7.) In support of this contention, Nurse Barber provided an affidavit (the "Barber Affidavit"), in which she averred that, "[d]uring [Plaintiff's] incarceration, [she] did not provide care to [Plaintiff] as his care was provided by other medical staff members who were working at the [Randolph County] Detention Center

at the time of [Plaintiff's] incarceration." (Docket Entry 38, ¶ 5.) "To establish personal liability under [Section] 1983, [P]laintiff must affirmatively show that [Defendant] acted personally in the deprivation of [P]laintiff's rights. That is, [Defendant's] own individual actions must have violated the Constitution. Importantly, mere knowledge of such a deprivation does not suffice." Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018) (internal brackets, citations, and quotation marks omitted).

Nonetheless, evidence in the record identifies Nurse Barber as "the supervising nurse for the Randolph County Detention Center." (Docket Entry 42-1, ¶ 10). In addition, Plaintiff's medical records, provided by Nurse Barber, describe her position as "Administrator" and further reveal that she reviewed and approved medical treatment undertaken by her subordinates on Plaintiff's behalf. (See Docket Entry 38-1 at 3.) Liability may exist under Section 1983 where

> (1) [ ] the supervisor had actual or constructive knowledge that h[er] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;
> (2) [ ] the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and
> (3) [ ] there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted). For reasons that follow, the record does not support a finding against Nurse Barber as to these factors.

15

In her summary judgment brief, Nurse Barber argued that "the undisputed evidence establishes that Plaintiff received extensive medical treatment and was appropriately treated for his medical conditions and complaints." (Docket Entry 37 at 7.) In furtherance of that argument, Nurse Barber's affidavit attests to the medical staff's interactions with Plaintiff (see Docket Entry 38, ¶¶ 8-20), and avers that, "[i]n all interactions between medical staff and [Plaintiff, he] was treated in accordance with the accepted standards of practice" (id., ¶ 21).

Additionally, Nurse Barber submitted an affidavit from Nurse Davis ("the Davis Affidavit"), a "licensed practical nurse licensed to practice in the [S]tate of North Carolina." (Docket Entry 39, ¶ 2.) The Davis Affidavit states that, "[d]uring [Plaintiff]'s incarceration, [Nurse Davis] provided medical care to him" (id., ¶ 5), and that, "other nursing staff also rendered care . . . [to include] Physician's Assistant [] Maldonado" (id., ¶ 7). The Davis Affidavit further avers that, "[i]n all of [her] interactions with [Plaintiff, Nurse Davis] attempted to treat him in accordance with [her] best medical judgment pursuant to the accepted standards of practice for [registered nurses] within [her] scope of practice. She was never deliberately indifferent to [Plaintiff]'s medical needs." (Id., ¶ 21.)

The Davis Affidavit provides this detailed explanation of the medical staff's interactions with Plaintiff:

16

When [Plaintiff] was booked into the Randolph County Detention Center on December 1, 2017, an officer completed an inmate assessment. [Plaintiff] reported that he was or had been receiving mental health counseling, that he was taking various medications, had a spinal cord injury, and was currently taking medications for emotional and/or mental health problems, and had been in the hospital for emotional and/or mental health problems. At booking, an officer also completed an inmate medical history form. [Plaintiff] reported he had a history of heart problems, high blood pressure, recent head injury, and receipt of psychiatric care. Plaintiff specifically reported that he had no history of diabetes.

The following day, on December 2, 2017[,] I saw [Plaintiff] in medical [and] completed a Medical Staff Screening Form for [him]. [Plaintiff] reported taking Effexor for depression, Gabapentin for a spinal cord injury, Wellbutrin for depression, Zantac for heartburn, Naproxen for pain, and eardrops for an ear infection. [Plaintiff] also reported he was legally blind and used the drug Ativan.

In compliance with policy and protocol, I had [Plaintiff] sign an authorization form for the release of his medical information from his pharmacy, Walgreens, in order to verify his reported medications.

That same day, December 2, 2017, an order was entered by [P]hysician's [A]ssistant ["(PA")] Maldonado, to monitor [Plaintiff] for Ativan withdrawal and start [him] on Librium for withdrawal and to continue his home medication Effexor.

On December 3, 2017, [Plaintiff] refused medical treatment for evaluation for detoxification.

On December 4, 2017, [Plaintiff] inquired about the status of his other reported medications. I advised [Plaintiff] that he was receiving his medication Effexor and that I would refax the authorization request to [his] pharmacy in order to verify [his] additional reported medications.

On December 5, 2017, the medical department received [Plaintiff's] pharmaceutical records from Walgreens, showing current prescriptions for [his] Wellbutrin and Gabapentin medications.

17

On that same day, December 5, 2017, an order was entered by [PA] Maldonado, to continue [Plaintiff's] home medications of Wellbutrin and Gabapentin.

On December 6, 2017, [Plaintiff] submitted a medical request for Baclofen and his heartburn medication, and complained of pain from a previous spinal cord injury.

On December 7, 2017, I saw [Plaintiff] in the medical department. I advised [him] and noted that Baclofen was not a current prescription based on his pharmaceutical records. I also noted that [Plaintiff] was receiving Gabapentin for pain from a spinal cord injury.

On the same day, December 7, 2017, [PA] Maldonado, issued an order for [Plaintiff] to receive a bland diet and Zantac to treat Plaintiff's heartburn.

On December 12, 2017, Plaintiff was evaluated by medical staff for detox monitoring and [he] showed no signs or symptoms of withdrawal. It was noted that [his] blood pressure was slightly elevated. At his detox visit, [Plaintiff] mentioned receiving Baclofen. Medical staff explained to [him] that this medication was not current. [Plaintiff] also mentioned continued back pain and medical staff advised [him] to submit a medical request for further evaluation and assessment of his back pain.

On that same day, December 12, 2017, [PA] Maldonado issued another order to continue [Plaintiff's] detox monitoring for five [] additional days.

(Id., ¶¶ 8-20 (numbers in original omitted).)

In addition, Nurse Barber attached Plaintiff's medical records, which further foreclose a finding of deliberate indifference in the medical staff's actions toward Plaintiff. (See Docket Entry 38-1 at 1-20.)[6]   Notably, on the evening of Plaintiff's arrival to the

_____

6 Nurse Barber also submitted Plaintiff's medical records as an exhibit to the Davis Affidavit. (See Docket Entry 39-1 at 1-20.)  These records duplicate the records attached to the Barber Affidavit. (Compare id., with Docket Entry 38-1 at 1-20.)

18

Randolph County Detention Center, Plaintiff completed Initial Inmate Assessment and Inmate Medical History forms in which he listed a spinal cord injury (Docket Entry 38-1 at 16), but no history of diabetes (id. at 20). Per the screening form completed the following day, Plaintiff reported a "Nov 2016 surgery" for a "spinal cord injury," but did not report a recent fall or a history of diabetes. (Id. at 13; see also id. (lacking any indication that Plaintiff possessed insulin at the time that he entered the detention center).) The medical records include two Inmate Sick Call Slips, submitted by Plaintiff on December 5, 2017, and December 6, 2017, in which he complains of "serious pain due to spinal cord damage" (id. at 8-9), and "neck, shoulder, [and] back pain" (id. at 9). Notably, in contrast to the Complaint's (unsworn) allegations (see Docket Entry 2 at 31), Plaintiff failed to indicate a recent fall (see Docket Entry 38-1 at 8-9). In other words, the record bears no signs that Plaintiff suffered from a medical emergency ignored by medical staff.

Lastly, as the Davis Affidavit notes, Plaintiff's medical records show that medical staff administered his medication appropriately. (See id. at 1-2; see also id. at 6, 10.) These records further reveal that medical staff, including PA Maldonado, examined Plaintiff twelve of the fourteen days of his incarceration for detox treatment. (See id. at 2-6.) The Davis Affidavit also indicates that, upon "[Plaintiff's] mention[ of] continued back

pain[,] medical staff advised [him] to submit a medical request for further evaluation and assessment of his back pain." (Docket Entry 39, ¶ 19.) The record does not reflect that Plaintiff submitted such a request prior to his departure from the detention center two days later. (See id. at 1-6; see also Docket Entry 38-1 at 1-20.)

In sum, the record does not support a finding that Plaintiff "suffer[ed] from a serious medical need and that, subjectively, the [medical staff was] aware of the need for medical attention but failed to either provide it or ensure the needed care was available." Legg, 2013 WL 474804, at *3 (citing Farmer, 511 U.S. at 837). Rather, the record confirms that Plaintiff merely disagreed with the handling of his medical care, which - given the lack of a showing of "exceptional circumstances," Wright, 766 F.2d at 849 - fails to support a Section 1983 deliberate indifference claim. Plaintiff thus cannot establish an underlying constitutional injury at the hands of medical staff supervised by Nurse Barber (e.g., Nurse Davis).[7]

Accordingly, to the extent Nurse Barber could face liability based on her responsibility for the actions of any medical staff who treated Plaintiff, such claim(s) must fail. See Huggins v. Weider,

_____

[7] Any (unverified) factual allegations in the Complaint or Plaintiff's summary judgment response suggesting otherwise do not constitute evidence. See Maisha, 2015 WL 277747, at *1. Nor does any evidence submitted with Plaintiff's belated supplement raise a material factual dispute on this front. (See Docket Entry 45 at 1-15.)

20

105 F. App'x 503, 505 (4th Cir. 2004) ("There can be no liability under [Section] 1983 on the part of a supervisory official in the absence of a constitutional violation on the part of those supervised."). The Court therefore should enter summary judgment for Nurse Barber on Plaintiff's deliberate indifference claim.

####    4. Captain Hill

With respect to Captain Hill, the Complaint alleges that he "turn[ed] a blind eye to Plaintiff's serious medical needs . . . [i]n violation of Randolph County policies[,] ordinance[,] regulation." (Docket Entry 2 at 10.) Specifically, the Complaint states that Plaintiff "wrote [Captain Hill] several [i]nmate letters[] and spoke to him on or about December 10, 2017." (Id. at 32.) According to the Complaint, Captain Hill then "advised [Plaintiff] that he would talk to medical staff[] and review [Plaintiff's] intake records." (Id.) The Complaint then asserts that, "[u]pon information and belief[,] this did not happen in violation of [the] Eighth and Fourteenth Amendments. . . ." (Id.)

Captain Hill's summary judgment brief contends that "[t]he undisputed evidence in this matter demonstrates that [he] did not actually know of and disregard any objectively serious medical condition, medical need, or risk of harm." (Docket Entry 42 at 13 (emphasis omitted).) Captain Hill provided an affidavit in support of this contention (the "Hill Affidavit"), in which he averred that, "[u]pon receipt of [Plaintiff']s Inmate Grievance Form, which

21

probably reached [his] desk the day after [Plaintiff] submitted it, [Captain Hill] immediately went to the general population cell block where [Plaintiff] was housed to personally speak with him about his concerns."  (Docket Entry 42-1, ¶ 7.)

During that conversation, according to the Hill Affidavit, Plaintiff complained that "he could not be extradited back to Arizona because he had a back injury" (id., ¶ 8), as well as that "the nurses at the Randolph County Detention Center were not giving him his prescription pain medication and were otherwise not providing him with adequate medical care" (id.).  Captain Hill has sworn that he assured Plaintiff that he would "talk with the supervising nurse to relay [Plaintiff's] complaints and to make sure that the medical staff was aware of [Plaintiff's] concerns."  (Id., ¶ 9.)  Notably, Captain Hill averred that, at the time that the conversation took place, he did not observe Plaintiff exhibiting any signs or symptoms of any "obvious medical emergency."  (Id., ¶ 8.) To the contrary, according to Captain Hill, "[Plaintiff's] speech was clear and coherent.  He did not have any visible wounds or injuries, nor did he appear to be experiencing any sort of seizure, problems breathing, bleeding, [any] cardiac event, or any other obvious medical condition or situation.  He did not appear . . . to be in any sort of serious pain."  (Id.)

That same day, Captain Hill has sworn that he spoke with Nurse Barber regarding Plaintiff's concerns as they related to his medical

22

treatment.  (Id. ¶ 10.)  Per the Hill Affidavit, Nurse Barber confirmed that Plaintiff received a routine proper medical assessment upon his arrival to the detention center and, further, that medical staff contacted Plaintiff's pharmacy regarding his medications, as per protocol.  (Id.)  Additionally, Captain Hill averred that he learned from Nurse Barber that the medical staff could not dispense narcotic pain medication to inmates and, instead, provided Plaintiff with non-narcotic pain medication.  (Id.)  The Hill Affidavit then states that Nurse Barber informed Captain Hill that medical staff had examined Plaintiff "virtually every day since . . . December 2, 2017."  (Id.)  Lastly, according to the Hill Affidavit, Nurse Barber notified Captain Hill that "Plaintiff did not have any sort of condition that she believed would prevent him from traveling."  (Id.)  "Based upon the information that Nurse Barber [] provided to [him, Captain Hill has sworn that he] went away feeling comfortable and assured that [Plaintiff] was in fact receiving adequate and appropriate medical attention and care. [He] did not . . . know of any reason to . . . doubt Nurse Barber's integrity, truthfulness, or professionalism."  (Id.)

Therefore, contrary to the conclusory statements in Plaintiff's (unverified) Complaint, the record evidence indicates that Captain Hill acted swiftly by relaying Plaintiff's concerns to the supervisory nurse and verifying that medical staff properly cared for him.  The record thus refutes any claim that Captain Hill denied

Plaintiff medical treatment, deliberately interfered with Plaintiff's medical treatment, or "tacitly authorized" or showed "indifferen[ce]" to medical staff misconduct, <u>Krug</u>, 2014 WL 4955365, at *7.[8]

As a result, the Court should enter summary judgment for Captain Hill on Plaintiff's deliberate indifference claim.

### 5. Officer Love

As a final matter regarding Plaintiff's deliberate indifference claim(s), the Complaint alleges that Officer Love "deprived [P]laintiff of his benefit to constitutionally adequate medical care." (Docket Entry 2 at 11.) In particular, the Complaint states that, on the day of his arrest, Plaintiff "advised [Officer Love and the accompanying officer] about his spinal cord injury [and] therefore [they] were on notice thereby triggering their duty to take Plaintiff [] to a local hospital [e]mergency [r]oom before tak[ing] him to the Randolph County Jail." (<u>Id.</u> at 13.) Further, in his unverified response, Plaintiff asserted that Officer Love "became [a] gatekeeper[] to [Plaintiff's e]mergent [sic] medical care once [he] placed [Plaintiff] under arrest . . . ." (Docket Entry 44 at 3.)

---

8 Plaintiff's belated supplement does not contain any evidence that would create a material factual dispute about Captain Hill's follow-up with medical staff regarding the issues Plaintiff raised during their meeting. (<u>See</u> Docket Entry 45 at 1-15.)

24

Officer Love's summary judgment brief contends that Plaintiff's deliberate indifference claim fails, because the record does not support even a "finding of negligence." (Docket Entry 32 at 8.)[9] To sustain that contention, Officer Love submitted an affidavit (the "Love Affidavit"), in which he averred the following:

> On December 01, 2017, I received and confirmed a Fugitive Warrant issued from the state of Arizona for [Plaintiff] . . . . Sergeant Michael Rahming, of the Maricopa County Police Department, notified the Archdale Police Department that [Plaintiff] was an absconder who had broken the terms of his parole. [Plaintiff] was currently staying with his sister . . . [in] Archdale, [North Carolina] . . . .
>
> Following the confirmation of the arrest warrant, I and one other officer proceeded to [Plaintiff's sister's residence in Archdale, North Carolina]. Upon arrival, we knocked on the door and informed [Plaintiff] that he was under arrest as a fugitive. [Plaintiff] was allowed to gather his clothing and medication prior to leaving. As we escorted [Plaintiff] to the patrol vehicle, he mentioned that he had a back issue but never stated he needed medical assistance. If medical assistance is ever needed during such arrests, it is my custom and habit to call for emergency medical services.

<hr />

9 Officer Love's summary judgment brief also states that the "punitive damages claims against [him] in his official and individual capacities[] are barred because [they] are not available against a municipal defendant or its employees when sued in their official capacities." (Docket Entry 32 at 17 (all caps and bold font omitted).) Further, he contends that, "since the underlying claims against [him] for compensatory damages should be dismissed, the claims for punitive damages should [also] be dismissed." (Id. at 18.) Lastly, Officer Love argues that "there is no evidence of any factors or conduct which rise to the level of fraud, malice, or willful or wanton conduct . . . ." (Id.) As detailed in the discussion that follows above, the record does not show any unconstitutional actions by Officer Love, thereby mooting the need for a discussion of the propriety of punitive damages.

25

It took around forty-five [] minutes to reach the Randolph County Courthouse. During that ride, [Plaintiff] and I engaged in conversation and at no point did [he] either seek medical attention or ask to go to a hospital. Upon arrival to the Randolph County Courthouse, [Plaintiff] was placed before Magistrate [] McPherson, who signed an order finding that [Plaintiff's] detention was justified . . . . At that point in time, I left [Plaintiff] in the custody of the Randolph County Courthouse for further processing.

(Docket Entry 32-1, ¶¶ 5-7 (numbers in original omitted).)

As discussed previously, "[d]eliberate indifference is a very high standard-a showing of mere negligence will not meet it." Grayson, 195 F.3d at 695. Additionally, "the Supreme Court has explained that failure to obtain immediate medical care constitutes an Eighth Amendment violation only if that delay was 'objectively, sufficiently serious' to constitute the 'denial of the minimal civilized measures of life's necessities.'" Wynn v. Mundo, 367 F. Supp. 2d 832, 838 (M.D.N.C. 2005) (citing Farmer, 511 U.S. at 834), aff'd, 142 F. App'x 193 (4th Cir. 2005). Plaintiff has not presented evidence of such a serious medical need at the time of his arrest.

In that regard, the Complaint alleges that he "had fallen on November 29, 2017 within his sister's home . . . and on December 1, 2017[,] he took a much harder fall off the front porch falling down several steps just hours before his arrest." (Docket Entry 2 at 13.) Plaintiff's (untimely-filed) affidavit states that he "had fallen on 11/29/17 and the morning of 12/01/17." (Docket Entry 45, ¶ 1.) According to that affidavit, his "sister was going to drive

26

[Plaintiff] to the [e]mergency [r]oom." (Docket Entry 2 at 13-14.) Therefore, accepting Plaintiff's averments as true, although Plaintiff had fallen two days prior and on the morning of his arrest, he chose not to promptly seek emergency medical care.

The Fourth Circuit rejected a similar claim of deliberate indifference regarding an officer's decision to transport a detainee directly to the detention center instead of the hospital and provided the following reasoning:

> In this case there was no objective evidence available to [the officer] at the time of the incident that [the detainee] had a serious need for medical care. . . . . For at the time of their encounter, [the detainee] exhibited to [the officer] no visible external injuries. He did not have trouble breathing. He was not bleeding, was not vomiting or choking, and was not having a seizure. Furthermore, [the detainee] was conscious, at least somewhat responsive, and able to answer questions.

Grayson, 195 F.3d at 695. Likewise, the record here lacks any objective evidence that would have caused Officer Love to conclude that Plaintiff suffered from any "serious need for medical care." Id. Accordingly, Officer Love has established entitlement to summary judgment on Plaintiff's deliberate indifference claim.

### B. False Arrest and Wrongful Detention

Although the Complaint focuses on deliberate indifference claims, it also alleges that Plaintiff was "arrested and held without a warrant," and that "[his] detention was not justified and amounted to false arrest because he [] had no local charges and there was no legal authority to hold him." (Docket Entry 2 at 15.)

27

Plaintiff appears to specifically assert these claims against Officer Love and Captain Hill, by alleging that Officer Love had "[n]o documentation to justif[y] arrest" (id. at 11), and that Captain Hill "turn[ed] a blind eye to Plaintiff's . . . false arrest [and] wrongful confinement" (id. at 10).[10] More particularly, the Complaint alleges:

> [Plaintiff] wasn't provided with a copy of the warrant[] until January 15, 2018[,] in Arizona. Defendants only had a 'request to hold' . . . . This was invalid and amounted to false arrest[] as this message within law enforcement databank [sic] had no legal effect as it was not issued by a court. Also, Magistrate McPherson failed to sign all documentation[] so those documents were/are [] worthless piece[s] of paper[]. All defendants had no legal authority to hold Plaintiff [] for the State of Arizona.

(Id. at 39 (parenthesis omitted).)[11]

_____

10 The Complaint also states that Captain Hill "refused to accept [Plaintiff's] grievance by saying that [Plaintiff] had no local charges[] and Arizona was coming to pick [him] up real [sic] soon." (Docket Entry 2 at 43.) The record contradicts that (unsworn) allegation. (See Docket Entry 42-1, ¶ 7.) In any event, "inmates do not have a constitutionally protected right to a grievance procedure, and no liability exists under [Section] 1983 for a prison administrator's response to a grievance or appeal." Brown v. Virginia Beach Sheriff's Office, No. 1:17cv48, 2017 WL 6402987, at *3 (E.D. Va. Mar. 28, 2017) (unpublished) (citing Adams v. Rice, 40 F.2d 72, 75 (4th Cir. 1994)), aff'd in pertinent part, 697 F. App'x 161 (4th Cir. 2017).

11 Plaintiff attempts to support these allegations with a copy of the Magistrate's Order for Fugitive (Docket Entry 2 at 25), bearing this hand-written notation: "This document has no legal effect as it is not signed by the magistrate – so it's a worthless piece of paper itself. No legal authority to hold [Plaintiff], no copy of the warrant and [he] had less than a year to serve = false arrest!" (Id.) That attempt lacks merit. See Jilani v. Harrison, No. 5:15-CT-3271, 2018 WL 1545584, at *3 n.4 (E.D.N.C. Mar. 29, 2018) (unpublished) ("[The state magistrate judge] typed but did
(continued...)

In his summary judgment brief, Officer Love asserted that he "is a public official who arrested [] Plaintiff pursuant to a received and confirmed fugitive arrest warrant." (Docket Entry 32 at 5.)  According to Officer Love, "[g]iven the existence of said warrant, it is inarguable that [he] possessed sufficient . . . probable cause [which] prove[s] fatal to Plaintiff's claim . . . for either false arrest or unreasonable detention."  (Id.)[12]

In this situation, "[t]he right implicated [] is the Fourth Amendment right to be free from unreasonable seizures." Gantt v. Whitaker, 203 F. Supp. 2d 503, 511 (M.D.N.C. 2002) (citing Lambert v. Williams, 223 F.3d 257, 261 (4th Cir. 2000)), aff'd, 57 F. App'x 141 (4th Cir. 2003).  The Fourth Amendment "requires that arrests be made based upon probable cause and that a neutral and detached judicial officer evaluate probable cause as a condition of significant pretrial restraint of liberty."  Taylor v. Waters, 81

---

11(...continued)
not sign the warrant for plaintiff's arrest.  Although it appears plaintiff argues this somehow makes the arrest warrant invalid, this is not the case." (citing Fed. R. Civ. P. 5) (internal citations omitted)), aff'd, 732 F. App'x 208 (4th Cir. 2018).

12 In addition to his affidavit, Officer Love provided copies of the original and defendant's copy of the Fugitive Affidavit (Docket Entry 32-1 at 3; see also id. at 5), the Waiver of Extradition Findings and Order (id. at 4), a letter addressed to Plaintiff from the Arizona Department of Corrections regarding Plaintiff's eligibility for the Absconder Reduction Program pending his cooperation (id. at 6), an email from a fugitive investigator with the Arizona Department of Corrections providing the Archdale Police Department with Plaintiff's identifying information, including Plaintiff's status as an "absconder" (id. at 7), and a Magistrate's Order for Fugitive (id. at 8).

F.3d 429, 436 (4th Cir. 1996). "To state a [Section] 1983 violation for an unconstitutional seizure, an officer must have 'seized a plaintiff pursuant to legal process that was not supported by probable cause and the criminal proceeding must have terminated in the plaintiff's favor.'" White v. City of Greensboro, 408 F. Supp. 3d 677, 701 (M.D.N.C. 2019) (quoting Burrell v. Virginia, 395 F.3d 508, 514 (4th Cir. 2005)) (ellipsis and brackets omitted).

Here, Plaintiff's claim fails as the record indicates that probable cause existed for Plaintiff's arrest and detention. Officer Love averred that he "received and confirmed a Fugitive Warrant issued from the state of Arizona for [Plaintiff]. Sergeant Michael Rahming of the Maricopa County Police Department, notified the Archdale Police Department that [Plaintiff] was an absconder who had broken the terms of his parole." (Docket Entry 32-1, ¶ 5.) In addition, Officer Love provided an email from a "Fugitive Investigator" with the Arizona Department of Corrections and the "USMS Violent Offender Taskforce" (id. at 7), sent to the Archdale Police Department indicating that "parole violater [Plaintiff was] living with his sister . . . [in] Archdale, NC" (id.). Also, both Plaintiff and Officer Love have provided the Court with the "Magistrate's Order for Fugitive" (id. at 8; see also Docket Entry 2 at 25), in which Magistrate McPherson "f[ound] that [Plaintiff] ha[d] been arrested without a warrant and [that his] detention [was] justified because . . . there [was] probable cause to believe that

on or about [December 1, 2017,] in [Maricopa County, Arizona, the crime of absconding] was committed and [Plaintiff] has been charged with the commission of that crime and has fled from justice." (Docket Entry 32-1 at 8.) The order further indicates that it was "issued pursuant to Section 15A-734 of the North Carolina General Statutes upon information furnished under oath by the arresting officer(s) shown. A copy of this Order has been delivered to the defendant." (Id.)[13]

In response to Plaintiff's challenge regarding the validity of his arrest and commitment documents, Captain Hill has sworn that he "advised [Plaintiff] that when a magistrate or other judicial officer issues an order directing that an individual be detained in the Randolph County Detention Center, that [he and other detention center staff] are legally bound to follow that order." (Docket Entry 42-1, ¶ 9.) Captain Hill also has averred that he "confirmed that there was in fact an order properly issued by a judicial

---

13 The Complaint also appears to contest Plaintiff's arrest and detention because he "wasn't provided with a copy of the warrant[] until January 15, 2018[,] in Arizona." (Docket Entry 2 at 39.) However, this argument also fails, as "an arrest is not unlawful due to the mere failure of an arresting officer to serve an arrestee with a copy of the arrest warrant." United States v. Stephens, No. 5:18CR38, 2019 WL 5445298, at *2 (W.D. Va. Oct. 23, 2019) (unpublished) (brackets and internal citations omitted); see also Bradley v. Extradition Corp. of Am., 758 F. Supp. 1153, 1156 (W.D. La. 1991) ("An arrestee need not be presented with a copy of the arrest warrant.").

official directing that [Plaintiff] be detained in the Randolph County Detention Center." (Id., ¶ 11.)

The record thus establishes that Officer Love possessed probable cause to believe that Plaintiff had absconded and that Arizona sought his arrest. Similarly, the record shows that Captain Hill verified that proper documentation existed providing for Plaintiff's arrest and detention. Under these circumstances, Plaintiff's claim(s) of false arrest and wrongful detention fail as a matter of law.

### C. Qualified Immunity

Officer Love, Nurse Barber and Captain Hill also have requested summary judgment based on qualified immunity. (Docket Entry 33 at 8-10; accord Docket Entry 37 at 10-11; Docket Entry 42 at 15-17.) "Qualified immunity from [Section] 1983 claims 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Doe ex rel. Johnson v. South Carolina Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Put simply, qualified immunity "ensures that officials are not unfairly strung up for money damages as a result of bad guesses in gray areas [and] [i]t encourages capable citizens to join the ranks of public servants by removing the threat of constant litigation." Braun v. Maynard, 652 F.3d 557, 560 (4th Cir. 2011)

32

(internal citation and quotation marks omitted). "Determining whether qualified immunity applies involves a two-prong inquiry: 'whether the facts make out a violation of a constitutional right' and 'whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct.'" West v. Murphy, 771 F.3d 209, 213 (4th Cir. 2014) (quoting Pearson, 555 U.S. at 232 (internal ellipsis omitted)).

For reasons discussed above, Defendants have identified an absence of evidence to support Plaintiff's claims of unlawful deprivation of his constitutional rights and thus the qualified immunity doctrine also defeats his claims.

## III. Official Capacity Claims

Lastly, Plaintiff cannot maintain his claims against Nurse Barber, Captain Hill, and/or Officer Love in their official capacities. First, concerning Officer Love and Captain Hill, because "claims against the officers in their official capacities are claims against the entities for which the officers were acting . . ., it must be shown that the actions of the officers were unconstitutional and were taken pursuant to a custom or policy of the entity." Giancola v. State of W. Va. Dep't of Pub. Safety, 830 F.2d 547, 550 (4th Cir. 1987) (citing Monell, 436 U.S. at 690-92); accord Gordon v. Kidd, 971 F.2d 1087, 1097 (4th Cir. 1992). To establish liability against a local government under Section 1983, a plaintiff must show that a "constitutional injury [wa]s

33

proximately caused by a written policy or ordinance, or by a widespread practice that is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" McFadyen v. Duke Univ., 786 F. Supp. 2d 887, 954 (M.D.N.C. 2011) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)), rev'd in part on other grounds, Evans v. Chalmers, 703 F.3d 636 (4th Cir. 2012). As detailed previously, the record does not support Plaintiff's unverified allegations of unconstitutional actions taken by Officer Love and/or Captain Hill.

Regarding Nurse Barber, the record (as discussed above) refutes the Complaint's mere allegations of deliberate indifference on her part. Therefore, as with Officer Love and Captain Hill, any official capacity claim as to Nurse Barber obviously fails as a matter of law. See Boston v. Davis, No. 3:11CV450, 2011 WL 6826812, at *6 (W.D.N.C. Dec. 5, 2011) (unpublished) ("Since there is no underlying constitutional violation by [the defendant] in his individual capacity, [the][p]laintiff's official capacity claims against [the defendant] should also be dismissed."), terminated on other grounds, 2012 WL 748675 (W.D.N.C. Mar. 8, 2012) (unpublished).[14]

---

14    Nurse Barber did not separately address Plaintiff's official capacity claim in her summary judgment filings. (See Docket Entry 37 at 1-15; see also Docket Entry 48 at 1-9.) However, because Plaintiff proceeds as a pauper (see Docket Entry 3), "the [C]ourt shall dismiss the case at any time if the [C]ourt determines . . . the action . . . is frivolous," 28 U.S.C.
(continued...)

Accordingly, the Court should enter summary judgment for Officer Love, Captain Hill, and Nurse Barber on any official capacity claims.

## CONCLUSION

Defendant SHP, Nurse Barber, Captain Hill, and Officer Love have established entitlement to judgment as a matter of law on Plaintiff's official and individual capacity claims.

**IT IS THEREFORE RECOMMENDED** that the Officer Love Motion (Docket Entry 31), the SHP Motion (Docket Entry 34), the Nurse Barber Motion (Docket Entry 36), and the Captain Hill Motion (Docket Entry 41), be **GRANTED** and that judgment be entered in each defendant's favor.

_/s/ L. Patrick Auld_
**L. Patrick Auld**
**United States Magistrate Judge**

July 10, 2020

---

14(...continued)
§ 1915(e)(2)(B)(ii). The obvious deficiency of Plaintiff's official capacity claim against Nurse Barber (in light of the lack of evidence to support any underlying constitutional violation by her) warrants dismissal under that provision.